Case number 21-7070, Capital Keys, LLC appellant versus Democratic Republic of Congo and Central Bank of the Democratic Republic of the Congo. Mr. Hantman for the appellant. Mr. Werner for the appellate. Good morning, your honors. Robert Hantman for Capital Keys, the appellant. I wish I could be there in person. My best argument, frankly, is the record below. It's absolutely undisputed that this contract, which was signed by the acting governor, was in 2013. $600,000 was paid. Undisputed. Mr. Mutombo, who now has risen after three years of litigation, he was also on the bank of Central Bank at the time. He never said a word. I think what's undisputed here is that after the contract was signed, there were no objections to the authority of the person who signed. Nobody did anything. But even worse, your honors, which is unbelievable, in litigation, there were three years where there was fighting over getting a default. Three years. And the making sure that the Bank of Congo and the Congo were notified of everything. Not one peep, not one word contesting the contract. In fact, during the period of time of the three years, even before the three years, it's undisputed in the record, the members of the Congo came to said that he did a great job. Undisputed work was done. It's undisputed. And there's a letter from the head of the International Monetary Fund. And it's A41, in which the head of the Monetary Fund tells the president of the Congo to pay the bill. It's undisputed. Mr. Hammond, if you could maybe focus on the legal issues here about the waiver of foreign sovereign immunity, and whether there was actual or apparent authority to sign the contract. Your honor, number one, the actual authority was that the head of the Central Bank of the Congo, he signed, okay? There's no question that he was the authority. Now, at the same time, Mr. Mutombo, which really, he's not even with the government anymore, okay? He was present during the- Can you hold on a second? Just to get an answer to Judge Rouse's question. You're now talking about actual authority, right? And what's your argument that he had actual authority to sign this? Number one, he has authority to sign for different contracts, okay? He has actual- But it says, the statute says, the statute says he has authority to solely or jointly sign contracts concluded by the bank. That means authorized by the bank. Well, he was signing on behalf of the bank, number one. Would you please look at the line? I'm looking at article 31, okay? Would you just look at that language and focus on that? It says, he's authorized, the governor has authority to, quote, solely or jointly sign contracts concluded by the bank. To me, that says, if the bank has approved a contract, the governor can sign it. So, it requires approval, and I don't see any evidence in the record that the bank approved it. Well, Your Honor, quite frankly, there's absolutely no proof that they did not approve it. There's a suggestion- Can you, will you just focus? Do you agree with me, then, that this is a statute, this governing statute, that you agree with me that the governor only has authority to sign a contract approved by the bank, right? Do you agree with that? Yes, he can sign day-to-day contracts, which are not a question. This type of contract, he would need the approval of the bank, but to find that he did- So, where is that in the record? Where is there any evidence that the bank approved it? Well, simply, it seems that it would be absurd that the bank or the commissions were aware of in 2013. They never asked for the money to be paid back. They never complained that the governor didn't have the right to do it. Those facts may go to apparent authority, but, I mean, on the actual authority, I mean, is there any evidence that the governor had the authority of the board, the approval of the board, to sign this agreement? Well, Your Honor, if I may, there's no proof that he did not have the authority, and let me say this, okay? If he did not have the authority, how come, from 2013, nothing happened? How come, from 2015, for three years- Counsel, would you agree that, under the statute in our case law, you have the burden of, at least of production, of establishing that there was a waiver of sovereignty? Okay, well, number one, okay, you say that we have the burden of proof. Actually, in Mr. Falcoff's testimony in court, he said that people from the Congo came over to the United States he corresponded with them. They wrote him a letter. If you look at the record, it's voluminous, but it's very detailed. They wrote to him telling him the thanking for what he did, okay? That meets the burden. Then the burden shifts to the government or to the bank to say that all this didn't happen. You can't ignore the fact that there were representatives that over here, okay? The people who wrote to Mr. Falcoff, they never asked for the money back. Why did they ask for the money back? Why is there nothing in the record, absolutely nothing, an official stationary, to show that the Congo or the Central Bank, to this day, is questioning this. The only person who's questioning this is Mr. Mutombo, and Mr. Mutombo, he was in the United States. He met with Mr. Falcoff. This is the gentleman who's now saying that there was no authority, but he was in the United States, okay? It behooves, really, credibility that five years would go by and not one person says a word about anything. Now, the magistrate judge, he found that this case should go forward for a default. The district court judge initially found that there was a basis for a default. Then there's a motion to dismiss after five years from the time of this contract that you're saying maybe was not authorized. Somebody could have said it's not authorized. Nobody ever did. Then after the lawsuit was filed, nobody even put in an appearance. The State Department was never notified. The judge was never notified. Now you're saying that a United States company that undisputedly raised over $320 million under our unjust enrichment shouldn't get paid? If you look at the complaint, I'm sure you did. Under the unjust enrichment, there's over $300 million, which was substantiated in part by the head of the International Monetary Fund. It's an exhibit to the complaint. This was all ignored by the court below, Your Honor. The record evidence is clear to come back and say, well, there's not really proof that this was legitimate after five years of not anybody saying it's not legitimate defies reality. Again, this wasn't a summary judgment. This was a motion to dismiss. In a motion to dismiss, you have to accept everything that the plaintiff has submitted. You don't have to take the complaint. You could look at Mr. Falkoff's testimony. He testified at length. So again, you're asking me a negative. How can we prove that they had authority? There's more than enough evidence here to show that they had real authority and definitely apparent authority. Now there may be a dispute in different districts over what constitutes apparent authority or not apparent authority or real authority. Here we think there was authority for both. But you know what? If there's any doubt, why not just remand it for discovery? And then we can find out exactly what more details you need. But in a motion to dismiss, where you're accepting everything that's true, and you have documentation here, not just from Mr. Falkoff, but from the head of the International Monetary Fund, and say, well, we think there was no real contract here. If there's no contract here, there'll never be a contract. No entity, no foreign entity, can have five years of not questioning something, pay $600,000, can make continued promises to pay, and then say, well, you know, we're still not convinced that there really was a contract. They're in action alone. Mr. Hanson, you're over time. Unless my colleagues have any questions, we'll hear from the bank. Thank you. Mr. Werner, I believe you're muted. On my screen, it's still showing that you are muted. Can you hear me now? Yes. Yes. Okay. Sorry about that. Good morning. May it please the court. Paul Werner on behalf of the Central Bank of Sheppard Mullen. I'd like to start, if I may, with Judge Rao's question about actual authority and this idea that there's no proof that the governor did not have authority to enter this contract. In fact, there is very much proof that the governor did not have authority to enter the contract. We put an official version of the law governing the bank into the record, which makes abundantly clear that the governor has no authority to enter a contract like this without approval of the board. We also put into the record declarations from the head of the bank's legal department and also the then current governor of the bank, which confirms that the bank did not give the governor authority to enter any agreement with capital keys, which was necessary, as the district court pointed out, in a contract that sweeps far afield of the bank's purpose to stabilize prices and control the government's monetary policy. What's in the record as far as evidence of who paid the $600,000 and how it was paid? Sure. Judge Wilkins, there's only one piece of evidence related to $600,000 payment that supposedly was made. It's at A37 of the record, and it is an invoice from capital keys to the DRC. Importantly, it's not to the central bank. Also, I'd point out that that invoice came some two years after the contract was entered. The contract was entered, according to the complaint, after this payment was made. Curiously, there is no credit in the contract for the supposed payment. There is no evidence in the record that the payment was actually received. There is nothing, for example, from capital keys showing that it received any payment. There's only at A37 an invoice that's two years after the agreement was supposedly executed. Turning to the apparent authority issue. Mr. Werner, I had a question. Is there any evidence that contracts of this nature are usually approved by the board? Yes, you're on. There's no evidence one way or the other from capital keys. Again, we did put into the record declarations from the governor and the head of the legal department making clear that these types of contracts do, in fact, to be approved by the bank. As Judge Tatel pointed out in the earlier discussion, the plain language of the law at Article 31 makes very clear that it's framed in a past participle way that makes clear that the governor can sign contracts that are concluded by the bank. There is no evidence that this is a contract that was ever concluded by the bank. Mr. Werner, why does this contract not fall under Article 30 of the statute? The second clause, the governor can confer special powers or one or more representatives. He determines their duties, remuneration or compensation, if applicable. Why is capital keys not a representative that has you know, lobbying or consulting duties under Article 30? And because Article 31 does not apply to things concluded under Article 30. It's pretty clear that that article wouldn't apply for a couple reasons. One, this is not a contract that the governor could ever enter because it's not consistent with his primary objective. And also, based on the allegation of the complaint, this is a contract that purports to guarantee the debts and commitments of the DRC, which also the governor is prohibited from. So I don't think even accepting that article would apply. This is not the type of contract that the governor could ever sign off on. But I don't think that there is really any understanding or any evidence to suggest that capital keys is somehow being authorized to act as an agent of the central bank. Well, according to anything, it says that it was, you know, asked to represent the bank before, you know, different government bodies in the United States or certain international bodies like the IMF. So it's a kind of representative. Maybe there's no evidence. As the district court pointed out, there is no evidence, not a single iota that capital keys ever did anything to the central bank, whether as an agent or otherwise. But this this is the type of lobbying and other services agreement that that to the district court's mind, and I think is appropriate, really does sweep in to the type of act that would need to be approved by the bank because it is so far reaching and it goes far beyond the bank's central purpose of simply stabilizing prices and controlling the government, the country's monetary policy. If I could touch. I just said I do have one other question about this. So if I mean, assume just for the sake of argument that I think this statute regarding the bank is somewhat ambiguous, does in the Congo, does the president have the ability to interpret this document or to direct, you know, the head of the bank to take certain actions? No, the president does not. The bank is an independent agency and jurisdiction jurisdictionally distinct from the government. It's very clear. I direct the court to earlier articles. Article 16. It's very clear that the president cannot influence or direct the bank. The bank is independent. It's of course, its shares are owned ultimately by the DRC, but it is independent. And there's no evidence that the government controls or dominates the central bank in any way to develop that kind of principal and agent relationship. Could the president do that type of supervision or direction of the bank through an ordinance or an edict or something like that? I mean, I'm not saying one necessarily existed. I know that's disputed between the parties, but could the president do that through an ordinance? Sure. I think that's possible. And that really gets to this Themis case that the appellant raises out of the New York district court, and then the second circuit where there really was an ordinance. And that's, that's important because that's a very clear distinction from what's going on in this case. There, the court found that there was an ordinance because there was a specific ordinance on the book that directed the finance member to implement an agreement and carry it out. But here there is no ordinance. Now, there's been a lot of discussion of letters from the Congo. There is no letter from the Congo in the record. In terms of the apparent authority, Mr. Hammond points to the court today to the same types of things that the district court properly found were insufficient to establish any apparent authority because none of the pieces of evidence that are pointed to have anything to do with the from the bank to the governor or any manifestation by the bank to capital keys that the governor had authority to enter the contract. There's an invoice. The invoice was directed to the Congo, not to the central bank. There's no evidence that the invoice was paid. There are vague references to members of the Congo, none of whom have ever been identified. There's a reference to the IMF. Of course, the IMF can't manifest to capital keys that the governor has any authority to enter a contract on his behalf. And again, there's this letter from the Congo that we've heard a lot about and yet have never, ever seen. I'm happy to answer any further questions. Thank you, Judge Rao. Nothing? Nothing further. Okay, thank you. I just had one other. Are the French and English versions of this law both authoritative in the Congo or is only the French version authoritative? It is an official translation, but I don't know specifically. I'm happy to submit further information on that. I do not know off the top of my head. One last point, there was an argument, Mr. Hammond, to the effect of, well, this should just go back for further discovery. The district court below exercised sound discretion to deny discovery. And of course, this court has affirmed many district courts that deny discovery in FSIA cases for sound reasons. Here, capital keys never came forward with any good faith belief of any specific information that either bore on the commercial activity or the waiver issue. And the district court properly found that any relevant evidence would be in possession of capital keys and not necessary to obtain from the central bank. With respect to waiver, any manifestations from the bank to capital keys, of course, would be in possession of capital keys. And it would have information related to whatever commercial activities it purportedly undertook here in the United States or any evidence that the bank undertook any commercial activity in connection with the contract in the United States, which it did not. Thank you, your honors. Thank you. Mr. Hammond, you are out of time, but you can have one minute. Mr. Hammond, you are muted. Okay. If you look at the appendix A-147, you'll see a litany of details, okay, which are undisputed at this point, which show that the person who now, after five years, is alleging somehow that the acting president at the time of the bank or the commissioner didn't have authority, he was here. He traveled here. He met with Mr. Falkhoff. If you look at A-147, undisputed evidence that this gentleman, to this day, he has nothing to do with the Congo. We don't even know whether he's authorized to have done this on behalf of the Congo. There's not one document from the official government or from the bank which supports the defendant's position. There's nothing. There's nothing whatsoever. Zero. If this court were to allow this ruling to stand, no company in the United States will ever, ever have any opportunity to get paid for services they rendered. Here, there's over $322 million, $352 million, which was delivered as a result of capital of key services, and you have the letter from the head of the World Bank urging the money be paid. That's not proof. Mr. Hampton, thank you very much. Thank you. Thank you. Case is submitted.
judges: Tatel, Wilkins, Rao